*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

MARK EDWARD FEUSS,

        Defendant-Appellant.

UNPUBLISHED
January 15, 2019

No. 337190
Jackson Circuit Court
LC No. 15-004654-FH

Before: BOONSTRA, P.J., and SAWYER and TUKEL, JJ.

PER CURIAM.

Defendant appeals by right his jury trial convictions of two counts of reckless driving causing death, MCL 257.626(4). The trial court sentenced defendant to 5 to 15 years' imprisonment for each conviction. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Defendant's convictions arose from a traffic accident that occurred on US-127 in Jackson County. Defendant was operating a 160,000-pound "gravel train" semitrailer truck when it collided with a Ford Focus that was waiting to turn left onto Liberty Road.

Robert Grant testified that he was riding as a passenger in Desiree Roberts' vehicle on the day of the accident and that he observed defendant's truck on US-12 driving "from one side of the road, off the shoulder, into oncoming traffic and then back on the road, repeatedly." He saw the truck cross the "fog line" on the shoulder of the highway at least 10 times and cross the center line four or five times. At one point, Grant observed the truck cross into oncoming traffic and force a vehicle to veer onto a side road to avoid an accident. Grant testified that the vehicle he was in turned onto US-127 following defendant's truck. After turning onto US-127, the truck continued to swerve "[n]ot as much over the center line, but he was still swerving real bad to the shoulder." Grant saw defendant's truck collide with the Ford Focus. Grant testified that defendant's semitrailer truck as shown in photographs of the crash scene depicted the truck that he observed on the highway.

Roberts testified that she drove behind defendant's truck for a while on US-12 and then on US-127, and observed the truck veering to the right over the fog line. Roberts also testified that the truck at one point drifted over the centerline and caused an oncoming vehicle to leave the road to avoid a collision (although she testified that the other vehicle turned into a driveway rather than a side road). Roberts testified that she was afraid the truck would cause an accident and that she considered calling 911. Roberts saw defendant's truck collide with a vehicle in front of the truck.

Susan Keunner testified that she was driving behind defendant's semitrailer truck on US-127 immediately before the accident. She saw the truck pull over onto the right shoulder of the road without stopping and then return to the right lane. Keunner testified that she passed the truck and that it then pulled into the passing lane behind her. She then noticed a small car ahead of her with its left turn signal activated, indicating that the vehicle was preparing to turn left onto Liberty Road. She began to slow down, but noticed that the truck was not slowing down and was overtaking her from behind; Keunner testified that she tapped on her brakes 10 to 20 times in an attempt to alert the driver of the truck to slow down. Keunner then decided to pull to the right to get around the small car that was turning left. After doing so, Keunner looked in her rearview mirror and saw the semitrailer truck collide into the back of the small vehicle.

Bradley Youtsey testified that he was driving in the opposite direction of the truck on US-127 when the accident happened. He testified that he saw Keunner's vehicle "whipping around" a smaller vehicle that was turning left onto Liberty Road. Youtsey opined that that truck driver did not have time to react to avoid the smaller vehicle after Keunner's vehicle left the lane.

Motor Carrier Officer Daryl Myers of the Michigan State Police testified that he inspected the truck after the accident and that the truck appeared to have been in good working mechanical order before the accident. Sergeant Alan Avery of the Michigan State Police testified as an expert in crash reconstruction. Sergeant Avery estimated that the speed of the truck was 59 to 63 miles per hour at the time that the truck's driver applied the brakes, although he agreed that the outcome of the crash would not likely have been different if the truck had been travelling 55 miles per hour.

The prosecution also introduced into evidence a text message from defendant to his wife on the morning of the accident in which defendant informed his wife that he was "[r]eally tired today." Defendant's cellular phone records indicated that defendant placed a phone call about a minute before the accident. Defendant stated to police that he had used a hands-free device to place the call. A sheriff's deputy testified that defendant's cell phone records did not indicate whether defendant had done so.

A sample of defendant's blood was taken shortly after the accident and was analyzed by the Michigan State Police Forensic Laboratory. At trial, Dr. Michele Glinn, PhD., testified for the prosecution as an expert in toxicology. Dr. Glenn testified that defendant's toxicology report showed low levels of Valium and Vicodin in his blood. The levels were consistent with a single dose having been taken a day before the accident. She testified that Vicodin could cause nervous system and respiratory system depression, sleepiness, slowed reaction time, and drowsiness. Dr. Glinn testified that "anytime you have more than one drug together, you have the potential for the effects to be exaggerated or for the drug to persist in your system longer." Dr. Glinn agreed

that taking Valium and Vicodin together would make a person less alert, more drowsy, less able to focus, and less able to concentrate.

Dr. Glinn reviewed part of defendant's pharmacy record and concluded that defendant could not have taken the drugs chronically based on the amount that was prescribed and the date that it was prescribed. She testified that the effects of the drugs would be greater on someone who did not take the drugs on a regular basis.

On cross-examination, Dr. Glinn agreed that she had no personal knowledge of the actual impact that the medications had on defendant. Dr. Glinn testified that it was possible that the drugs did not impact defendant, but she stated that it did not seem likely that the drugs had no impact on defendant on the day of the accident. Dr. Glinn testified that both drugs were "within therapeutic range."

Dr. Glinn concluded that, in her opinion, defendant "had levels of this drug in his system that potentially could have central nervous system effects on him." She stated: "And the extent to which that was manifest, I cannot say for certain, but I would expect there to be some effects from these drugs." She clarified that defendant "could have been" drowsy at the time of the accident, but she did not "know the extent to which he was showing effects of the drugs." Dr. Glinn stated: "It is my opinion that he is likely feeling the effects, some effects. The extent to which he is feeling it I cannot say."

Defendant presented several experts in his defense. His accident reconstruction expert, Rodney Sadler, testified that he believed the prosecution's expert's speed calculations "could be more accurate" if the expert had included more data points or conducted a drag factor test. Sadler opined that defendant was not driving in a "willful way to endanger other people on the road." However, he agreed that defendant may have been "inattentive or distracted." Defendant also presented the testimony of Larry Baareman, an expert in commercial trucking, who opined based on his review of the available information that defendant had been properly operating the "gravel train" truck. Baareman also testified that he had observed gravel trains frequently crossing the fog line in the area of US-127 where the accident occurred. Baareman opined that a vehicle flashing its brake lights would not be an effective way to alert a truck driver to slow down.

Defendant's toxicology and emergency room medicine expert, Dr. Bryan Judge, testified that defendant's blood level for Vicodin and Valium was below the therapeutic range. Dr. Judge opined that, based on the toxicology report, defendant had last taken Vicodin one or two days before the accident, and had last taken Valium at least 40 hours before the accident. He testified that the levels of these drugs in defendant's blood were "very, very low levels, very minute amounts in a person that weighs 250 pounds." Dr. Judge also testified that defendant had showed no indication of being under the influence of these drugs when he was taken to the emergency room following the accident. He concluded that the "minute amounts" of the prescriptions "did not contribute in the least at all" to the accident.

Defendant was convicted and sentenced as described. He moved for a new trial on the grounds that the evidence in support of his convictions was insufficient or that the verdict was

against the great weight of the evidence. The trial court denied his motion. This appeal followed.

## II. ADMISSIBILITY OF DR. GLINN'S EXPERT TESTIMONY

Defendant argues that the trial court erred by admitting the expert testimony of Dr. Glinn. We disagree. We review for an abuse of discretion a trial court's decision to admit evidence. *People v Bynum*, 496 Mich 610, 623; 852 NW2d 570 (2014). We review de novo preliminary questions of law. *Id*. A trial court abuses its discretion when it admits evidence that is inadmissible as a matter of law. *Id*. We review unpreserved challenges to the admission of evidence for plain error affecting substantial rights. See *People v Carines*, 460 Mich 750, 752-753; 597 NW2d 130 (1999).

### A. MRE 403

Defendant first argues that the trial court erred by failing to exclude Dr. Glinn's testimony under MRE 403, because Dr. Glinn's testimony was of low probative value and the probative value was outweighed by the danger of unfair prejudice. We disagree.

MRE 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." In general, relevant evidence is admissible at trial. See MRE 402. But even if evidence is relevant under MRE 401, MRE 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."

"The 'unfair prejudice' language of MRE 403 refers to the tendency of the proposed evidence to adversely affect the objecting party's position by injecting considerations extraneous to the merits of the lawsuit, e.g., the jury's bias, sympathy, anger, or shock." *People v Cameron*, 291 Mich App 599, 611; 806 NW2d 371 (2011) (some quotation marks and citations omitted). "Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *People v Crawford*, 458 Mich 376, 398; 582 NW2d 785 (1998).

In this case, the jury was tasked with determining whether defendant was guilty beyond a reasonable doubt of reckless driving causing death. The prosecution was required to prove beyond a reasonable doubt that defendant operated his truck with willful and wanton disregard for the safety of persons or property. See MCL 257.626. Evidence that defendant had levels of narcotic medication in his system at the time of the accident was relevant to this determination, as it had at least some tendency to make a material fact "more probable or less probable that it would be without the evidence." MRE 401. Dr. Glinn testified that Vicodin and Valium had adverse side effects including sedation, calming, sleepiness, slowed reaction time, and drowsiness. Although Dr. Glinn could not state with specificity the impact, if any, that the medication had on defendant at the time of the accident, she testified that the medication could impact people differently and opined that defendant would have been at least somewhat affected. This testimony was relevant in that it tended to support the prosecution's theory that defendant operated the truck on the day of the accident despite knowingly be too tired to properly control it.

Dr. Glinn's testimony was relevant to determining whether defendant may have been feeling sedated or drowsy as a result of his medications and, by continuing to drive, was acting with willful and wanton disregard for the safety of persons or property.

In addition to being relevant, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. MRE 403. Dr. Glinn's testimony did not inject into the proceeding extraneous considerations such as "jury's bias, sympathy, anger, or shock." *Cameron*, 291 Mich App at 611. Moreover, even if the evidence was only marginally probative, there was no danger that the jury would give Dr. Glinn's testimony undue or preemptive weight. *Crawford*, 458 Mich at 398. On cross-examination, Dr. Glinn agreed that she did not know the extent to which the drugs may have impacted defendant. She testified that they "potentially could have central nervous system effects on him," and agreed that if defendant was awake and alert in the emergency room it would potentially militate against her view that defendant had suffered adverse effects from the medication. Defendant's emergency room medical records showed that he was awake and alert after the accident. Defendant's expert also testified to the low levels of the medications present in defendant's blood and opined that they had played no role in the accident. Dr. Glinn's testimony was not unfairly prejudicial.

## B. MRE 702

Defendant also argues that Dr. Glinn "misapplied standard principles and methods," such that her testimony was inadmissible under MRE 702. However, defendant did not raise an MRE 702 objection or move for a *Daubert*[1] hearing in the trial court. Instead, as noted above, defendant objected on MRE 402 and MRE 403 grounds. After the trial court ruled that Dr. Glinn's testimony was admissible under MRE 402 and MRE 403, Dr. Glinn testified as an expert at trial. At the outset of her testimony, the prosecution tendered Dr. Glinn as an expert in the field of toxicology. The trial court asked defense counsel if he had any voir dire, and defense counsel stated: "No and I have no objection, Your Honor." In doing so, defendant waived any MRE 702 objection to Dr. Glinn offering her expert opinion on the toxicology results. See *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000) (quotation marks and citations omitted) ("Waiver has been defined as the intentional relinquishment or abandonment of a known right."). Here, by affirmatively indicating that he did not object to Dr. Glinn being qualified as an expert, failing to request a *Daubert* hearing, and failing to challenge the methods and principles underlying Dr. Glinn's testimony, defendant waived any objection under MRE 702.

Moreover, even if we were to treat the issue as unpreserved as opposed to waived, there is no plain error on the record. *Carines*, 460 Mich at 752-753. Defendant argued that Dr. Glinn's opinion that the medications may have affected his cognitive abilities at the time of the accident was mere speculation, citing Dr. Judge's testimony that the medications were below the therapeutic range. However, Dr. Glinn testified to the level of medications in defendant's blood with reference to the "Winek scale." Dr. Judge testified that the Winek scale is a reference that is used within the profession "to determine if a drug is therapeutic or possibly toxic." Dr. Judge

---

[1] *Daubert v Merrell Dow Pharm*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

acknowledged the widespread use of the Winek scale and did not challenge the use of the scale itself, but rather opined that the state used "really sensitive instructions" in order to "pick up very small quantities of the drug." Further, Dr. Glinn did not opine that defendant specifically was impaired by the levels of Valium and Vicodin in his system; in fact, she admitted that medication tolerance could reduce the drowsiness and sedating effects of these drugs. Dr. Judge and Dr. Glinn both acknowledged that there is wide variability in how individuals respond to these drugs. In short, both experts testified using the Winek scale, and agreed generally with regard to its shortcomings in determining the drugs' effect on a specific person, although they reached different conclusions.

Based on the information presented to the trial court, there was no plain error in the admission of Dr. Glinn's testimony under MRE 702. *Carines*, 460 Mich at 752-753. Defendant's argument to the contrary does not concern admissibility, but rather witness credibility. Yet, "[w]itness credibility and the weight accorded to evidence is a question for the jury . . . ." *People v McGhee*, 268 Mich App 600, 624; 709 NW2d 595 (2005). Defendant was free to (and did) argue that Dr. Judge was more credible and that Dr. Glinn's testimony was not supported by the evidence. The jury was free to weigh Dr. Glinn's testimony and determine her credibility.

### III. SUFFICIENCY OF THE EVIDENCE

Defendant argues that there was insufficient evidence to support his convictions. We disagree. We review de novo a challenge to the sufficiency of the evidence. *People v Henderson*, 306 Mich App 1, 8; 854 NW2d 234 (2014). When analyzing a claim of insufficient evidence, we view the evidence in the light most favorable to the prosecution to determine "whether any rational trier of fact could have found that the essential elements of the crime charged were proven beyond a reasonable doubt." *People v Lundy*, 467 Mich 254, 257; 650 NW2d 332 (2002). "[C]ircumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *People v McKinney*, 258 Mich App 157, 165; 670 NW2d 254 (2003) (quotation marks and citation omitted; alteration in original). "It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002).

A conviction for reckless driving causing death requires the prosecution to prove beyond a reasonable doubt that (1) the defendant operated a vehicle "upon a highway . . . or other place open to the general public," (2) the operation was "in willful or wanton disregard for the safety of persons or property," and (3) the defendant's operation of the vehicle "cause[d] the death of another person." MCL 257.626(2), (4). "[T]o show that a defendant acted in willful and wanton disregard of safety, something more than ordinary negligence must be proved." *People v Carll*, 322 Mich App 690, 695; 915 NW2d 387(2018) (quotation marks and citations omitted). "When willful and wanton behavior is an element of a criminal offense it is not enough to show carelessness. Rather, a defendant must have a culpable state of mind." *Id*. (quotation marks and citation omitted).

Viewing the evidence in a light most favorable to the prosecution, there was sufficient evidence to allow a rational jury to convict defendant beyond a reasonable doubt of two counts

of reckless driving causing death. There was no dispute that defendant operated a vehicle on a highway open to the public and that defendant's operation of the vehicle caused the death of two individuals. MCL 257.626(2), (4). The element at issue in this case is whether there was sufficient evidence to prove that defendant's operation of his vehicle was with willful or wanton disregard for the safety of persons or property. Evidence at trial established that a short time before the accident, defendant was driving his vehicle in a manner that "willfully or wantonly disregarded a high risk of serious injury" to persons on the highway. For example, multiple witnesses observed that defendant's truck repeatedly left its lane, both by crossing the fog line to the right and by driving into the oncoming traffic lane, which on one occasion forced an oncoming vehicle to abruptly leave the highway to avoid collision. Witnesses also testified that defendant's truck moved into the passing lane behind Keunner's vehicle and that it was following closely enough that it was unable to avoid the Ford Focus when Keunner's vehicle left the passing lane. There was evidence that defendant was aware that he was "really tired" earlier that day, that he had some levels of Vicodin and Valium in his system, and that he placed a cellular call immediately before the accident. While defendant points to discrepancies and inconsistencies between witnesses' testimony, the jury heard the testimony and was free to "determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *Hardiman*, 466 Mich at 428. A rational jury could have concluded that defendant drove while aware that he was extremely tired and possibly affected by his earlier use of narcotic medication, that defendant continued to drive after his truck repeatedly crossed the center and fog lines and forced an oncoming vehicle off the road, and that immediately before the accident defendant placed a cellular telephone call. These conclusions would support a finding that defendant operated his vehicle recklessly causing death. See *Boos v Sauer*, 266 Mich 230, 233; 253 NW 278 (1934) (noting, in the context of a driver that fell asleep while driving, that falling asleep while driving constitutes gross negligence if there was "such prior warning of the likelihood of sleep that continuing to drive constitutes reckless disregard of the consequences.")

## IV. GREAT WEIGHT OF THE EVIDENCE

Finally, defendant argues that the trial court erred by denying his motion for a new trial on the ground that the jury verdict was against the great weight of the evidence. We disagree. "We review for an abuse of discretion a trial court's grant or denial of a motion for a new trial on the ground that the verdict was against the great weight of the evidence." *People v Lacalamita*, 286 Mich App 467, 469; 780 NW2d 311 (2009). "An abuse of discretion occurs when a trial court chooses an outcome falling outside the range of reasonable and principled outcomes." *Id*.

"The test to determine whether a verdict is against the great weight of the evidence is whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand." *Id*. "Generally, a verdict may be vacated only when the evidence does not reasonably support it and it was more likely the result of causes outside the record, such as passion, prejudice, sympathy, or some other extraneous influence." *Id*. "Conflicting testimony, even when impeached to some extent, is an insufficient ground for granting a new trial." *Id*. (quotation marks and citation omitted). "Further, the resolution of credibility questions is within the exclusive province of the jury." *Id*

In this case, the evidence did not "preponderate[] so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand." *Id*. There was no evidence that the jury's verdict was more likely the result of causes outside the record. Instead, as discussed above, there was sufficient evidence to support defendant's convictions. Two witnesses testified that they observed defendant driving in an erratic manner shortly before the accident. Although defendant maintains that these witnesses were not credible because of discrepancies in their testimony, conflicting evidence is not sufficient to find that a verdict was against the great weight of the evidence. *Id*. Furthermore, the prosecution introduced other evidence to support defendant's guilt, including a text message, evidence that defendant placed a phone call shortly before the accident, and evidence that there were prescription drugs in defendant's system at the time of the accident. The jury's verdict was not against the great weight of the evidence and the trial court did not abuse its discretion by denying defendant's motion for a new trial. *Lacalamita*, 286 Mich App at 469.

Affirmed.


/s/ Mark T. Boonstra
/s/ David H. Sawyer
/s/ Jonathan Tukel